## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

        Plaintiff,

      vs.                   **Case No. 05-40045-01-RDR**

HUMBERTO NUNEZ-BUSTILLOS,

        Defendant.

_____

### MEMORANDUM AND ORDER

This matter is presently before the court upon defendant's motion to suppress.  The court has conducted a hearing on the motion and is now prepared to rule.

The defendant is charged in a two-count indictment.  He is charged, along with co-defendant Laura Elena Morales, with conspiracy to possess with intent to distribute approximately 11 kilograms of cocaine in violation of 21 U.S.C. § 846 and possession with intent to distribute approximately 11 kilograms of cocaine in violation of 21 U.S.C. § 841(a)(1).  Morales has entered into a plea agreement with the government, but the agreement has not as yet been approved by the court.  The charges arise from a traffic stop on Interstate 35 in Osage County, Kansas on March 9, 2005.

In his motion, the defendant contends (1) the initial stop was illegal; (2) he was subsequently illegally detained; and (3) the consent to search was not valid.  Having carefully

considered the evidence offered at the hearing, the court now
makes the following findings of fact and conclusions of law.

FINDINGS OF FACT

1.  On March 5, 2005, Clayton Ellis, a deputy with the
Osage County Sheriff's Department, was patrolling Interstate
35 in Osage County, Kansas.  At approximately 11:50 p.m., he
was parked in the median of the four-lane highway.  He
observed a minivan traveling north on I-35.  He decided to
follow it.  He eventually caught up with the minivan and
followed it for two to three miles.  During this period,
Deputy Ellis drove about four to six car lengths behind the
minivan.  He did move closer on at least one occasion to
observe that the minivan had a Texas license plate.  During
the last one-half mile, he noticed the minivan weaving in its
lane.  He then noticed that it crossed over the fog line on
the right side on two occasions.  After the minivan returned
to its lane after traveling over the fog line for the second
time, the minivan continued to weave in its own lane.  Deputy
Ellis decided to stop the minivan for a violation of K.S.A. 8-
1522(a)--failure to maintain a single lane of travel.  At
approximately 11:58 p.m., the minivan pulled over after Deputy
Ellis turned on his patrol car's emergency lights.

2.  The night was clear with no unusual weather
conditions.  There was no precipitation on the roadway, and

there was only a slight breeze.  The roadway where Deputy Ellis allegedly observed the traffic violation was flat and straight.  Traffic was light.

3.   The encounter at the side of the highway was videotaped by a camera located in Deputy Ellis' patrol car. The camera is stationary and only shows a view of the rear of the minivan.  The camera is activated when the emergency lights in the patrol car are turned on.  The camera is equipped with sound, but the only recording during this traffic stop occurred while Deputy Ellis was in his patrol car.

4.   Deputy Ellis has been employed by the Osage County Sheriff's Office for a period of three and one-half years.  He was previously employed as a police officer with the Osage City Police Department for two years.  He has received basic law enforcement training with some special training in drug investigation and drug interdiction.

5.   After the minivan pulled over, Deputy Ellis approached the driver's side of the minivan.  He contacted the driver, who was later identified as Humberto Nunez-Bustillos. He told Nunez-Bustillos who he was and why he had been stopped.  He asked Nunez-Bustillos for his driver's license and registration.  The passenger, who was subsequently identified as Laura Elena Morales, handed her driver's license

to Deputy Ellis and explained that Nunez-Bustillos had a
license but he had left it at home.  Deputy Ellis noticed that
Nunez-Bustillos appeared very nervous.   Deputy Ellis asked
about their travel plans.  Morales said they were coming from
El Paso and going to Kansas City for about a week.  She said
they were about to pull over because Nunez-Bustillos was
tired.  Deputy Ellis asked to whom the minivan was registered.
Morales indicated that the minivan belonged to her mother-in-
law and provided a name.  Deputy Ellis then requested Nunez-
Bustillos accompany him to his patrol vehicle, and he
complied.

     6.  Deputy Ellis and Nunez-Bustillos engaged in some
conversation.  This discussion was difficult because Nunez-
Bustillos appeared to have limited use of English.  He had
some trouble understanding and some trouble articulating his
answers.  Deputy Ellis has a very limited understanding of
Spanish, Nunez-Bustillos' primary language.  Despite these
problems, the two men were able to communicate in a limited
way.

     7.  Deputy Ellis contacted his dispatcher and sought
information on the minivan, Nunez-Bustillos' purported license
and criminal history, and Morales' license and criminal
history.  He asked Nunez-Bustillos how he was related to
Morales.  Nunez-Bustillos had some difficulty understanding

this question and eventually agreed that he was Morales'
father.

8.  Deputy Ellis then returned to the minivan to check
the vehicle identification number.  While he was at the
minivan, he entered into a conversation with Morales.  He
asked Morales about her relationship with Nunez-Bustillos.
She said they were friends.

9.  Deputy Ellis returned to his patrol car.  He received
his requested information from the dispatcher.  He found no
problems with the vehicle or the driver's licenses.  He did
learn, however, that the minivan was registered in a different
name than the one provided by Morales.  He also learned that
both occupants of the minivan had prior drug convictions.  He
then told Nunez-Bustillos that he was only going to give him a
warning.  Deputy Ellis returned the documents he had received
to Nunez-Bustillos.  Nunez-Bustillos said "bye" and Deputy
Ellis said "bye-bye."  Nunez-Bustillos began to exit the
patrol car.  Deputy Ellis asked if he could ask a couple more
questions.  Nunez-Bustillos eventually said yes.  Nunez-
Bustillos sat back down.  Deputy Ellis asked Nunez-Bustillos
if had any drugs in the minivan, and the defendant said no.
Deputy Ellis then asked whether he had any marijuana, cocaine,
methamphetamine or heroin in the minivan.  Nunez-Bustillos
said no to each one, but paused when Deputy Ellis mentioned

cocaine.  Deputy Ellis then asked if he could search the
vehicle.  The defendant readily said "alright."  Deputy Ellis
then gave Nunez-Bustillos a written consent form that
contained both an English and Spanish consent.  Initially,
Nunez-Bustillos asked, "What for?"  Deputy Ellis said for
drugs.  The defendant responded, "Okay."  Nunez-Bustillos
appeared to read the form and then signed the Spanish portion
of the form.

10.  Deputy Ellis then proceeded to talk with Morales.
He asked her if there were any drugs in the minivan.  She said
no.  Deputy Ellis asked her if he could search the minivan.
She said yes.  Deputy Ellis then produced the written consent
form and she signed the English portion of the form.

11.  The written consent form reads as follows:

I,_____, hereby grant my consent to
_____, Officers of the _____ to
search the following described vehicle below
including luggage, containers, and contents of all.
This includes the removal of any suspicious paneling
or other vehicle components and the least intrusive
access to any constructed compartment used for the
purposes of concealing contraband. . . . I
understand that I have the right to refuse to
consent to the search described above and to refuse
to sign this form.  I further state that no
promises, threats, force, physical or mental
coercion of any kind whatsoever have been used
against me to get me to consent to the search
described above or to sign this form.

12.  Deputy Ellis' discussions with Nunez-Bustillos and
Morales were conducted in a conversational tone.  He did not

use any threats, promises or coercion during his consultation with them.

13.   Deputy Ellis searched the minivan and found a brick-like package covered in black electrical tape inside a bag in the rear cargo area of the vehicle.   Deputy Ellis believed this package was cocaine.   Nunez-Bustillos and Morales were then placed under arrest.   Nine additional packages were subsequently found.

CONCLUSIONS OF LAW

1.   A traffic stop is a seizure coming within the purview of the Fourth Amendment to the United States Constitution. United States v. Botero-Ospina, 71 F.3d 783, 786 (10th Cir. 1995) (en banc), cert. denied, 518 U.S. 1007 (1996).   A traffic stop is reasonable under the Fourth Amendment at its inception if the officer has either probable cause to believe a traffic violation has occurred or a reasonable articulable suspicion that the motorist in question has violated or is violating any one of the applicable traffic and equipment regulations of the jurisdiction.   United States v. Hunnicutt, 135 F.3d 1345, 1348 (10th Cir. 1998).

2.   During a routine traffic stop, the detaining officer is permitted to ask such questions, examine such documentation, and run such computer verifications as necessary to determine that the driver has a valid license and

is entitled to operate the vehicle.  <u>United States v. Miller</u>,
84 F.3d 1244, 1250 (10th Cir.), <u>cert. denied</u>, 519 U.S. 985
(1996).  The officer may detain the driver and his vehicle as
long as reasonably necessary to make these determinations and
to issue a citation or warning.  <u>United States v. Martinez</u>,
983 F.2d 968, 974 (10th Cir. 1992), <u>cert. denied</u>, 508 U.S. 922
(1993).  However, if the officer wants to detain the driver
for further questioning, he may do so if "(1) 'during the
course of the traffic stop the officer acquires an objectively
reasonable and articulable suspicion that the driver is
engaged in illegal activity;' or (2) 'the driver voluntarily
consents to the officer's additional questioning.'"  <u>United
States v. Elliott</u>, 107 F.3d 810, 813 (10th Cir. 1997) (quoting
<u>United States v. Sandoval</u>, 29 F.3d 537, 540 (10th Cir. 1994)).
If the officer continues to question the driver in the absence
of either of these two circumstances, then "any evidence
derived from that questioning (or a resulting search) is
impermissibly tainted in Fourth Amendment terms."  <u>Id</u>.
(internal quotations and citation omitted).

    3.  The court finds that there was probable cause for the
stop of the minivan.  The defendant veered off the highway on
two occasions and was weaving in his lane.  There were no
conditions on March 5, 2005 that would have made it
impracticable for the defendant to maintain a single lane of

travel.  The observations by the officer, given the existing circumstances, demonstrate a violation of K.S.A. 8-1522.  <u>See</u> K.S.A. 8-1522(a) ("Whenever any roadway has been divided into two (2) or more clearly marked lanes for traffic,. . . vehicle[s] shall be driven as nearly as practicable entirely within a single lane."); <u>United States v. Ozbirn</u>, 189 F.3d 1194, 1198 (10th Cir. 1999) ("[Officer] had probable cause to stop [defendant for a violation of K.S.A. 8-1522] after he saw the motor home drift onto the shoulder twice within a quarter mile under optimal road, weather and traffic conditions.").

4.  The court must disagree with the suggestions of the defendant that <u>United States v. Gregory</u>, 79 F.3d 973 (10th Cir. 1996) and <u>United States v. Ochoa</u>, 4 F.Supp.2d 1007 (D.Kan. 1998) require a different result on the issue of the reasonableness of the initial stop.  Both cases are distinguishable from the instant case.  <u>See</u> <u>Gregory</u>, 79 F.3d at 975-78 (single instance of swerving onto shoulder did not constitute violation of Utah statute similar to K.S.A. 8-1522 where defendant was driving U-Haul on a mountainous, winding road, in windy conditions); <u>Ochoa</u>, 4 F.Supp.2d at 1011-12 (single instance of swerving onto shoulder was not violation of K.S.A. 8-1522, particularly where "troopers caused or contributed to the drift").  The circumstances of those cases do not exist here.

5.  Having concluded that the initial stop of the
defendant was reasonable, we must examine the reasonableness
of the subsequent detention.  "In determining whether a driver
and police officer are engaged in a consensual encounter in
the context of a traffic stop, there are few, if any,
bright-line rules." Elliott, 107 F.3d at 813.  Rather, we
must consider "the totality of the circumstances in a
particular case." Id. at 814.  While the return of documents,
such as a driver's license or other personal papers, is a
prerequisite to an encounter becoming consensual, the Tenth
Circuit has acknowledged it "is not always sufficient to
demonstrate that an encounter becomes consensual." Id.; see
also Gregory, 79 F.3d at 979.  Accordingly, even after the
officer returns a driver's papers, the encounter may not be
consensual where "there was evidence of a 'coercive show of
authority, such as the presence of more than one officer, the
display of a weapon, physical touching by the officer, or his
use of a commanding tone of voice indicating that compliance
might be compelled.'" Elliott, 107 F.3d at 814 (quoting
United States v. Turner, 928 F.2d 956, 959 (10th Cir. 1991)).
However, the ultimate test is whether "a reasonable person
under the circumstances would believe he was free to leave or
disregard the officer's request for information." United
States v. McKneely, 6 F.3d 1447, 1451 (10th Cir. 1993).

6.  The court does not find that the defendant was
illegally detained.  The defendant was detained only while
Deputy Ellis carried out the normal duties and
responsibilities of a typical traffic stop.  The defendant was
not detained following the return of his documents.  His
actions demonstrate that he understood that he was free to
leave after he received the documentation.  He was then asked
by Deputy Ellis if he would answer some additional questions
and he agreed to do so.  The request by Deputy Ellis was non-
threatening and friendly.  The court recognizes that the
defendant has some difficulty understanding English, but he
appears to have understood the request made by Deputy Ellis
and agreed to remain to answer some questions.  Thus, Deputy
Ellis' request to search the minivan took place during a
consensual encounter.  In light of this determination, the
court need not consider whether there was reasonable suspicion
to detain the defendant.

7.  Finally, the court shall consider the issue of
consent.  A defendant who voluntarily consents to a search
waives his Fourth Amendment rights, and the police officer may
conduct the search without probable cause or a warrant.  See
Schneckloth v. Bustamonte, 412 U.S. 218, 235 (1973).  The
voluntariness of consent must be determined from the totality
of the circumstances, and the government bears the burden of

proof on the issue.  <u>United States v. Zubia-Melendez</u>, 263 F.3d 1155, 1162 (10th Cir. 2001).  The government must show that there was no duress or coercion, express or implied, that the consent was unequivocal and specific, and that it was freely and intelligently given.  <u>Id</u>.

8.  The court finds that the consent was freely and intelligently given.  This might be a close case without the written consent.  The court readily acknowledges that the language barrier might have made a finding of consent difficult.  However, the presence of the written consent in Spanish makes this issue easy to resolve.  There is no evidence to suggest that the defendant did not read or understand the form.  The language of the form is quite clear and even indicates that an individual may refuse to consent to a search.  Under the totality of the circumstances, the court finds the consent given by the defendant was made freely and intelligently.

9.  With these findings, the court shall deny defendant's motion to suppress.

**IT IS THEREFORE ORDERED** that defendant's motion to suppress evidence seized and statements obtained (Doc. # 33) be hereby denied.

**IT IS SO ORDERED.** Dated this 11th day of August, 2005 at Topeka, Kansas.

s/Richard D. Rogers
United States District Judge